IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-00931-MJW

YMCA OF PUEBLO and
YMCA COMMUNITY CAMPUS,

Plaintiffs,

v.

SECURA INSURANCE COMPANIES,

Defendant.

---

**ORDER**
**on**

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**
**AND BRIEF IN SUPPORT THEREOF**
**(Docket No. 27)**
**and**

**DEFENDANT SECURA INSURANCE COMPANY'S COMBINED MOTION**
**AND BRIEF IN SUPPORT OF SUMMARY JUDGMENT**
**(Docket No. 28)**

---

**MICHAEL J. WATANABE**
**United States Magistrate Judge**

The parties in this insurance dispute have filed cross-motions for summary judgment. (Docket Nos. 27 & 28.) They have also consented to magistrate jurisdiction under 28 U.S.C. § 636(c). (Docket Nos. 15 & 16.) The Court has reviewed the parties' filings (Docket Nos. 27–31 & 34), taken judicial notice of the court's file in this case, and considered the applicable Federal Rules of Civil Procedure, statutes, and case law. Now being fully informed, the Court makes the following findings of fact, conclusions of law, and order granting summary judgment in favor of Defendant.

2

## Summary Judgment Standard

Rule 56(a) provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, interrogatories, and admissions on file together with affidavits, if any, which it believes demonstrate the absence of genuine issues for trial." *Robertson v. Board of County Comm'rs of the County of Morgan*, 78 F. Supp. 2d 1142, 1146 (D. Colo. 1999) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Mares v. ConAgra Poultry Co.*, 971 F.2d 492, 494 (10th Cir. 1992)). "Once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in the complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried." *Southway v. Central Bank of Nigeria*, 149 F. Supp. 2d 1268, 1273 (D. Colo. 2001), *aff'd*, 328 F.3d 1267 (10th Cir. 2003). "These facts may be shown 'by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings by themselves.'" *Id.*

## Undisputed Facts

The parties agree to the following facts for purposes of summary judgment, except as noted herein.

Plaintiffs are the named insureds on an insurance policy issued by Defendant. The insurance policy was in effect during October 2013.

3

The policy insures Plaintiffs' property, a YMCA facility in Pueblo.  The facility is a one-story recreation center with masonry walls and a concrete slab-on-grade foundation; it consists of children's play areas, a gymnasium, exercise/weight rooms, meeting rooms, a library, offices, and three separate swimming pools including a therapy pool.  The parties agree that the building exhibited distress cracks from settling as early as October 2012, and also in May 2013; the parties dispute the relevance of the cracking/settling in these time periods.

On October 11, 2013, Plaintiffs discovered a leaking water line in the men's shower/locker room, where one shower's on/off valve had become detached from the water pipe behind the wall.  The leak was repaired that same day.

On October 13, 2013, according to Plaintiffs, an employee "discovered and reported that the pool deck near the therapy pool and the surrounding block walls had shifted and collapsed."  (Docket No. 27, p.4.)  Defendant admits the basic premise of damage to the property but disputes whether "collapsed" is the appropriate word—preferring the term "shifted downward."  (Docket No. 30, at 2–3.)  The extent of damage will be discussed in more detail below, in the relevant portion of the legal discussion.

As part of this damage, several leaks were discovered in the pipes under and near the therapy pool, and the therapy pool itself lost several inches of water.  The pool and its pipes, flues, and drains were insured property under the policy.

Plaintiffs put in a claim for the damage to the pool, pool deck, and surrounding walls.  Within the week, Defendant notified Plaintiffs that it believed the damage was not covered, by virtue of the policy's exclusion for damage caused by earth movement.  The

4

following February, Defendant formally denied Plaintiffs' claim, citing both the earth-

movement exclusion and an exclusion for damage caused by subsurface water.

Plaintiffs then filed this lawsuit.

The parties generally agree as to the cause of the damage.  According to

Plaintiffs:

> The extensive damage to the premises was caused by the combination of
> settlement, which caused several pipes to break, and the water escaping
> from those broken pipes, resulting in great aggravation of the settlement.

(Docket No. 27, p. 4.)  Plaintiffs go on to elaborate:

> The damages in this case were caused by settlement which caused
> relatively large pipes to break and resulted . . . in the discharge of many
> gallons of water into soil which is susceptible to collapse when exposed to
> water.  As a result of this discharge, the soils on which the Plaintiffs'
> building was sited, did collapse.  This collapse is the cause of the damage
> to the premises.

(*Id.* p.8.)  And again:

> [T]he experts are in general agreement that the damages to the premises
> of Plaintiffs occurred when soil settlement caused some underground
> pipes to burst, releasing any [sic] considerable amount of water, causing a
> good deal of additional settlement and damage.

(Docket No. 29, p.2.)  Similarly, according to Defendant:

> [T]he parties' experts agree that the damage to the Building was caused
> by soil settlement below the slab-on-grade floors of the Building.

(Docket No. 30, p.3).  Stated differently by Defendant:

> The parties' experts agree that the damage resulted from wetting of the
> collapsible soils supporting the Building.

(Docket No. 28, p.2.)  Thus, the parties agree that soil settlement created the damage to

the building—including causing water leaks, thereby compounding the soil settlement

and ultimate damage.

5

The parties dispute whether the October 11, 2013, shower-room leak contributed to the settling and therefore to the damage.  (Docket No. 30, p.3.)  However, for purposes of summary judgment, Defendant accepts Plaintiffs' theory that it did.  (*Id.*; Docket No. 28, p.12.)

## Policy Provisions

The relevant portions of the policy are as follows:

**A.      Covered Causes of Loss**

. . . Covered Causes of Loss means Risks of Direct Physical Loss unless the loss is:

1.      Excluded in Section B., Exclusions; or

2.      Limited in Section C., Limitation;

that follow.

**B.      Exclusions**

1.      We will not pay for loss or damage caused directly or indirectly by any of the following.  Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

. . .

**b.      Earth Movement**

(1)      Earthquake . . .;

(2)      Landslide . . .;

(3)      Mine subsidence . . .;

(4)      Earth sinking (other than sinkhole collapse), rising or shifting including soil conditions which cause settling, cracking or other disarrangement of foundations or other parts of realty.  Soil conditions include contraction, expansion, freezing, thawing, erosion,

6

improperly compacted soil and the action of water under the ground surface.

But if Earth Movement, ad described in **b.(1)** through **(4)** above, results in fire or explosion, we will pay for the loss or damage caused by that fire or explosion.

(5)     Volcanic eruption . . .

. . .

**g.**[1]    **Water**

1.     Flood, surface water, waves (including tidal wave and tsunami, tides, tidal water, overflow of any body of water, or spray from any of these, all whether or not driven by wind (including storm surge);

2.     Mudslide or mudflow;

3.     Water that backs up or overflows or is otherwise discharged from a sewer, drain, sump, sump pump or related equipment;

4.     Water under the ground surface pressing on, or flowing or seeping through:

a.     Foundations, walls, floors or paved surfaces;

b.     Basements, whether paved or not; or

c.     Doors, windows or other openings; or

5.     Waterborne material carried or otherwise moved by any of the water referred to in Paragraph **1.**, **3.** or **4.**, or material carried or otherwise moved by mudslide or mudflow.

This exclusion applies regardless of whether any of the above, in Paragraphs **1.** through **5.**, is caused by

---

[1] The policy contains a "water exclusion endorsement" replacing paragraph "g"; the terms of that endorsement are presented here to make clear where they fit into the overall policy structure.

an act of nature or is otherwise caused.  An example of a situation to which this exclusion applies is the situation where a dam, levee, seawall, or other boundary or containment system fails in whole or in part, for any reason, to contain the water.

But if any of the above, in Paragraphs **1.** through **5.**, results in fire, explosion or sprinkler leakage, we will pay for the loss or damage caused by that fire, explosion or sprinkler leakage (if sprinkler leakage is a Covered Cause of Loss).

. . .

2.  We will not pay for loss or damage caused by or resulting from any of the following.

. . .

d.  (1)  Wear and tear;

(2)  Rust or other corrosion . . .;

(3)  Smog;

(4)  Settling, cracking, shrinking or expansion;

(5)  Nesting or infestation . . .;

(6)  Mechanical breakdown . . .;

(7)  The following causes of loss to personal property . . .;

But if an excluded cause of loss that is listed in **2.d.(1)** through **(7)** results in a "specified cause of loss" or building glass breakage, we will pay for the loss or damage caused by that "specified cause of loss" or building glass breakage.

. . .

k.  Collapse, including any of the following conditions of property or any part of the property:

(1)  An abrupt falling down or caving in;

8

(2)    Loss of structural integrity, including separation of parts of the property or property in danger of falling down or caving in; or

(3)    Any cracking, bulging, sagging, bending, leaning settling, shrinkage or expansion as such condition relates to **(1)** or **(2)** above.

But if collapse results in a Covered Cause of Loss at the described premises, we will pay for the loss or damage caused by that Covered Cause of Loss.

This exclusion, **k.**, does not apply:

(a)    To the extent that coverage is provided under the Additional Coverage – Collapse; or

(b)    To collapse caused by one or more of the following:

(I)     The "specified causes of loss";

(II)    Breakage of building glass;

(III)   Weight of rain that collects on a roof; or

(IV)   Weight of people or personal property.

. . .

## D.    Additional Coverage – Collapse

The coverage provided under this Additional Coverage – Collapse applies only to an abrupt collapse as described and limited in **D.1.** through **D.7.**

1.    For the purpose of this Additional Coverage – Collapse, abrupt collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose.

2.    We will pay for direct physical loss or damage to Covered Property, caused by an abrupt collapse of a building or any part of a building that is insured under this Coverage Form or that contains Covered Property insured under this Coverage

9

Form, if such collapse is caused by one or more of the following:

    a.    Building decay . . .;

    b.    Insect or vermin damage . . .;

    c.    Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs during the course of the construction, remodeling or renovation;

    d.    Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs after the construction, remodeling or renovation is complete, but only if the collapse is caused in part by:

        . . .

        (2)    One or more of the "specified causes of loss";

        . . .

3.    This Additional Coverage – Collapse does not apply to:

    a.    A building or any part of a building that is in danger of falling down or caving in;

    b.    A part of a building that is standing, even if it has separated from another part of the building; or

    c.    A building that is standing or any part of a building that is standing, even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

. . .

**F.    Additional Coverage Extensions**

. . .

2.    Water Damage, Other Liquids, Powder Or Molten Material Damage

If loss or damage caused by or resulting from covered water or other liquid, powder or molten material damage loss occurs, we will also pay the cost to tear out and replace any part of the building or structure to repair damage to the system or appliance from which the water or other substance escapes. . . .

. . .

**G.   Definitions**

. . .

2.     "Specified causes of loss" means the following: fire; lighting; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire-extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of now, ice or sleet; water damage.

. . .

c.     Water damage means accidental discharge or leakage of water or steam as the direct result of the breaking apart of cracking of a plumbing, heating, air conditioning or other system or appliance (other than a sump system including its related equipment and parts), that is located on the described premises and contains water or steam.

(Docket No. 28-1, p. 4, 20–29.)

## Discussion

I.   Law Governing Insurance Policies

This is a diversity case, and therefore Colorado law will control the interpretation

of the policy. *Leprino Foods Co. v. Factory Mut. Ins. Co.,* 453 F.3d 1281, 1287 (10th

Cir. 2006).  Under Colorado law, insurance contracts are to be construed in accordance

with the general laws of contracts.  *Federal Deposit Ins. Corp. v. American Casualty*

*Co.,* 843 P.2d 1285, 1289 (Colo. 1992).  An insurance contract must be interpreted

according to the plain and ordinary meaning of its language.  *Kellogg v. Metro. Life Ins. Co.,* 549 F.3d 818, 829 (10th Cir. 2008); *Chacon v. American Family Mut. Ins. Co.,* 788 P.2d 748, 750 (Colo. 1990).  When the language used in a contract is plain and its meaning is clear, the agreement must be enforced as written.  *In re May,* 756 P.2d 362, 368 (Colo. 1988); *Fire Ins. Exch. v. Rael by Rael,* 895 P.2d 1139, 1142 (Colo. App. 1995).  If a provision in the policy is ambiguous, the ambiguity must be construed against the insurer.  *Novell v. American Guar. and Liability Ins. Co.,* 15 P.3d 775, 778 (Colo. App. 1999).

"In ascertaining whether certain provisions of a document are ambiguous, the instrument's language must be examined and construed in harmony with the plain and generally accepted meaning of the words employed, and reference must be made to all the provisions of the agreement."  *Kane v. Royal Ins. Co. of America,* 768 P.2d 678, 680 (Colo. 1989).  A contract is ambiguous only if it is reasonably susceptible of more than one meaning.  *Horne Engineering Servs., Inc. v. Kaiser–Hill Co., LLC,* 72 P.3d 451, 453 (Colo. App. 2003).  Whether a provision is ambiguous is, like contract interpretation in general, a question of law.  *Id.*

Courts should be wary of rewriting contract provisions and should give the words contained in the contract their plain and ordinary meaning, unless contrary intent is evidenced within the contract itself.  *See, e.g., Lovell v. State Farm Mut. Auto. Ins. Co.,* 466 F.3d 893, 902 (10th Cir. 2006); *Cyprus Amax Minerals Co. v. Lexington Ins. Co.,* 74 P.3d 294, 299 (Colo. 2003).  Courts may neither add provisions to extend coverage beyond that contracted for, nor delete provisions to limit coverage.  *Cyprus Amax,* 74

12

P.3d at 299. When interpreting a policy's provisions, a court's construction "must be fair, natural, and reasonable rather than strained and strictly technical." *Massingill v. State Farm Mut. Auto. Ins. Co.,* 176 P.3d 816, 825 (Colo. App. 2007) (*citing Pub. Serv. Co. v. Wallis & Cos.,* 986 P.2d 924, 939 (Colo. 1999)).

II.    Earth Movement & Building Settlement

Plaintiffs argue that Paragraph B.2.d.'s flush language specifically provides coverage for losses caused by water leaks when those water leaks are caused by "settling, cracking, shrinking or expansion" (which all parties agree happened here). Defendant argue that the earth-movement exclusion in Paragraph B.1.b. bars coverage because the most direct cause of the damage was shifting soil under the concrete slab-on-grade floor (which, again, all parties agree happed here), and that the presence of water leaks cannot change the outcome because of the "anti-concurrent causation" ("ACC") clause in Paragraph B.1.

*Paragraph B.2.d.*

Plaintiffs' argument is foreclosed by the court's ruling in *High Street Lofts Condominium Association, Inc. v. American Family Mutual Insurance Co.*, 821 F. Supp. 2d 1235 (D. Colo. 2011). There, the policy at issue included an identical earth-movement provision, excluding coverage for damage cause by earth movement, *id.* at 1241, as well as a similar general exclusion for settling and cracking damage without regard to cause, *id.* at 1238 n.2. Chief Judge Marcia S. Krieger reasoned that the earth-movement exclusion would be superfluous if the terms were read to be overlapping. *Id.* at 1238 n.2. To avoid that outcome, Chief Judge Krieger held that "the only reasonable

interpretation of the standalone 'settling' exclusion is that it is referring to 'settling, [etc.]' that is caused by something other than earth movement (*e.g.* settling due to compaction or shrinking of building materials without corresponding soil movement or compaction)." *Id.*

The contract provisions at issue in *High Street Lofts* were materially similar to those at issue here: as noted above, the earth-movement exclusions are identical, and there is no indication of any material difference in the standalone settlement exclusions. The only apparent difference is that in *High Street Lofts*, the standalone provision was included under the heading "Other types of loss," a fact Chief Judge Krieger relied on to support her conclusion that the provision was not intended to override or overlap earlier provisions (like the earth-movement exclusion).  *Id.*  No such heading appears in the policy here.  But even so, Chief Judge Krieger's interpretation of the clause is still necessary to avoid rendering the earth-movement exclusion superfluous—and moreover, her interpretation is consistent with the general rule, in contract interpretation, that the more specific provision controls over the more general.  See *Massingill v. State Farm Mut. Auto. Ins. Co.*, 176 P.3d 816, 825 (Colo. App. 2007).  Accordingly, the Court agrees with and adopts Chief Judge Krieger's interpretation of these two policy terms. Paragraph B.2.d.(4)'s exclusion for "settling, cracking, shrinking or expansion" can apply only to such damage *not* caused by earth movement; when such damage *is* caused by earth movement, Paragraph B.1.b. controls instead.

Plaintiffs here make no argument that any damage (neither the at-issue damage discovered on October 13, 2013, nor the shower leak discovered on October 11, 2013)

was caused by some type of building settlement rather than soil settlement.  *See id.*

("*e.g.* settling due to compaction or shrinking of building materials without corresponding

soil movement or compaction").  Further, while none of the exhibits adduced by the

parties opine on the cause of the October 11th water leak, all parties agree that the

October 13th damage was caused at least in part by soil movement.  As a result, the

Court concludes that Paragraph B.1.b. is the relevant policy exclusion, not Paragraph

B.2.d.

### Paragraph B.1.b.

Defendant argues that Paragraph B.1.b. plainly bars coverage.  The Court

agrees with this conclusion, although it bears noting that Paragraph B.1.b. is not as

easy to apply as Defendant argues.

The provision bars coverage "for loss or damage caused directly or indirectly by":

> Earth sinking (other than sinkhole collapse), rising or shifting including soil
> conditions which cause settling, cracking or other disarrangement of
> foundations or other parts of realty.  Soil conditions include contraction,
> expansion, freezing, thawing, erosion, improperly compacted soil and the
> action of water under the ground surface."

(Docket No. 28-1, p.20.)  Chief Judge Krieger construed this exact language in *High*

*Street Lofts*, reasoning:

> The only provision . . . applicable to this situation is subparagraph (4),
> which is somewhat of an un-grammatical maze.  It begins by
> straightforwardly listing three verbs (technically verb-like gerunds)—
> "sinking," "rising," and "shifting"—each of which describes ways in which
> earth can move.  Somewhat jarringly, the sentence then interposes a
> definitional term—"including"—without clearly indicating what term or
> terms are being defined.  It proceeds to define one or more of the previous
> verbs with a noun phrase—"soil conditions."  Because the paragraph later
> defines the noun phrase "soil conditions" to itself comprise "contraction,
> expansion, freezing, thawing, erosion, improperly compacted soil and the

action of water underlying the ground surface," an ordinary insured attempting to understand the paragraph would simply substitute the definitional portion of the paragraph's second sentence for the term "soil conditions" in the first sentence, yielding a provision that purports to exclude coverage for "[e]arth sinking . . ., rising, or shifting including contraction, expansion, freezing, thawing, erosion, improperly compacted soil and the action of water underlying the ground surface. . . ."

This is somewhat of an improvement, although the object being modified by "including" is still unclear.  An ordinary insured might then conclude that a given unit of earth can only move in a few different dimensions: it can "sink" or "rise" relative to its neighboring units, it can "shift" either laterally or forward and backward compared to its neighbors, or it can "expand" or "contract" itself.  The remaining terms—"freezing, thawing, improperly compacted soils and the action of [subsurface] water"—describe mechanisms that would cause the earth to move, not movements themselves.  Finally, the terms "settling, cracking or other disarrangement of foundations" describe *damage* that might result when the earth moves as described.

821 F. Supp. 2d at 1241–42.  Having performed this exegesis of the exclusion's two

run-on sentences, Chief Judge Krieger concluded:

Thus, an ordinary insured might reasonably understand the exclusion in subparagraph (4) to exclude coverage for "settling, cracking or other disarrangement of foundations" of buildings (*i.e.* damage), when that damage results from the "sinking, rising, shifting, expansion, or contraction" of earth (*i.e.* movement), when that movement is caused by "freezing, thawing, erosion, improperly compacted soil, [or] the action of [sub-surface] water" (*i.e.* cause).

*Id.*

As so construed, there is little doubt that the exclusion applies to the facts of this

case.  Both Defendant and Plaintiffs take the position that the damage—which is agreed

to be settling, cracking, or disarrangement of the building's slab-on-grade concrete

foundation—was caused by shifting soil, itself caused by the action of water under the

ground surface. Accordingly, the damage in this case falls entirely within the earth-movement exclusion.

Plaintiffs' argument, while not explicit, suggests two rebuttals to this conclusion. The first rebuttal can be inferred from Plaintiffs' focus on the October 11th water leak as the initial cause of the soil settlement and, ultimately, the damage discovered on October 13th.[2] This focus suggests that Plaintiffs intend to point to the October 11th water leak—theoretically a covered peril—as the actual cause of loss, invoking the "efficient proximate cause" rule. *See Koncilja v. Trinity Universal Ins. Co.*, 528 P.2d 939, 940–41 (1974) ("'[I]n determining whether a loss is within an exception in a policy, where there is a concurrency of different causes, the efficient cause—the one that sets others in motion—is the cause to which the loss is to be attributed, though the other causes may follow it, and operate more immediately in producing the disaster." (quoting 6 G. Couch, Cyclopedia of Insurance Law, § 1466 (2d ed.))). But that rule does not help Plaintiffs, for two reasons. First, as noted above, Plaintiffs do not suggest that a type of settlement other than soil settlement caused the October 11th water leak. As a result, the rebuttal fails on its own terms, because the October 11th water leak is itself an excluded loss if it was caused by soil settlement. But more broadly, the argument also fails because the earth-movement exclusion falls under Paragraph B.1., which includes an anti-concurrent cause ("ACC") clause:

> We will not pay for loss or damage caused directly or indirectly by any of
> the following. **Such loss or damage is excluded regardless of any**

---

[2] As noted earlier, the parties do not agree that the October 11th water leak in fact contributed to the damage discovered on October 13th—but the dispute is immaterial, because (as explained above) Plaintiffs would lose even if they proved the connection.

> **other cause or event that contributes concurrently or in any**
> **sequence to the loss.**

(Docket No. 28-1, p.20 (emphasis added).)  ACC clauses, if they unambiguously apply, override the efficient proximate cause rule.  *Kane v. Royal Ins. Co. of Am.*, 768 P.2d 678, 685–86 (Colo. 1989).  And not only has this exact ACC language has been held to unambiguously overcome the efficient proximate cause rule, *Colo. Intergovernmental Risk Sharing Agency v. Northfield Ins. Co.*, 207 P.3d 839, 843 (Colo. App. 2008) (no coverage where loss was 90% attributable to covered peril but 10% attributable to excluded peril), it has also been held to apply to facts materially indistinguishable from this case, *Arkansas Valley Drilling, Inc. v. Cont'l W. Ins. Co.*, 703 F. Supp. 2d 1232, 1241 (D. Colo. 2010) (no coverage under identical exclusions with ACC where first-floor pipe burst, causing soil subsidence damage).

A second rebuttal might be inferred from Plaintiffs' focus on the source of the water: the men's locker room, on October 11th, and the therapy pool and related plumbing, on October 13th.  All of these pipes were included as insured property.  But the earth-movement exclusion makes no distinction based on the source of the water; rather, the exclusion covers damage to foundations caused by "the action of water under the ground surface," without any mention of how that water ended up under the ground surface.  To limit the exclusion to water from extrinsic sources, or to water that didn't come from insured property, would be to read words into the policy that aren't there.  Moreover, this argument has already been rejected by this court on materially indistinguishable facts.  *See Arkansas Valley Drilling*, 703 F. Supp. 2d at 1242.

The parties largely agree on the cause of the damage at issue in this case: in whole, or in part, the damage was caused by earth movement.  The Court concludes, therefore, that the damage is not covered by the policy by operation of Paragraph B.1.b.

### Defendant's Alternative Argument: the Water Exclusion Endorsement

Defendant argues, in the alternative, that the damage at issue here is also excluded under the subsurface-water terms of the water exclusion endorsement.  Because coverage is excluded under the earth-movement exclusion, the Court declines to address this alternative argument.

### Plaintiffs' Alternative Argument: Collapse Coverage

Finally, Plaintiffs argue that the policy provides coverage for the damage at issue under its "collapse" provisions—both (1) as an exception to the collapse exclusion, and (2) under the additional collapse coverage.  Defendant disputes both arguments, largely on the argument that the current condition of the property does not qualify as "collapsed."

Under the general exclusion for collapses, Paragraph B.2.k., Plaintiffs' argument is that the collapse exclusion does not apply if the collapse is caused by "specified causes of loss," including water leaks.  But that exception applies *to the collapse exclusion*.  Even if Plaintiffs were right about the damage being a "collapse," their argument establishes only that the collapse exclusion wouldn't apply.  It establishes nothing at all about the reach of the earth-movement exclusion.  *Cf. Greystone Const., Inc. v. Nat'l Fire & Marine Ins. Co.*, 661 F.3d 1272, 1289 (10th Cir. 2011), *as amended on reh'g* (Dec. 23, 2011) ("'Exceptions to exclusions narrow the scope of the exclusion

and, as a consequence, add back coverage.  But it is the initial broad grant of coverage, not the exception to the exclusion, that ultimately creates (or does not create) the coverage sought.'" (*quoting* David Dekker et al., *The Expansion of Insurance Coverage for Defective Construction,* 28 Constr. Law., Fall 2008, at 19–20)).  There is no reasonable way to interpret an exception appearing in subparagraph (b)(I) under Paragraph B.2.k. to be, also, an exception to the exclusion under Paragraph B.1.b.

Plaintiffs' argument as to the Additional Coverage – Collapse provision requires a longer discussion.  Plaintiffs' other arguments concern exclusions, or rather exceptions to exclusions; this argument, by contrast, concerns an affirmative grant of coverage.

Under Paragraph D.2.d.(2) of the policy, Defendant agreed to "pay for direct physical loss or damage to Covered Property caused by abrupt collapse of a building or any part of a building . . . if such collapse is caused by" "use of defective material or methods in construction . . . but only if the collapse is caused in part by" one of the "specified causes of loss."  (Docket No. 28-1, p.26.)  Viewed in the light most favorable to Plaintiffs,[3] the evidence supports findings that the damage was caused by defective construction and, in part, water leaks (a specified cause of loss).  (See Docket No. 28-2, pp. 5–7 (Defendant's expert, detailing recommended building practices that were not followed).)  Thus, if the damage constitutes a "collapse," the additional coverage applies.

---

[3] The evidence is not anywhere near sufficient to grant summary judgment in favor of Plaintiffs.  This discussion is for purposes of summary judgment in favor of Defendant— and for that reason, all disputes of fact will be resolved, and all reasonable inferences drawn, in Plaintiffs' favor.

The policy defines "collapse," for purposes of the additional coverage, as "an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose." (Docket No. 28-1, p. 26.)  It then goes on to state that the coverage does *not* apply to a "part of a building that is standing, even if it has separated from another part of the building" or a "building that is standing or any part of a building that is standing, even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion."  (*Id.*)  These definitions are in rough accord with Colorado cases construing the word "collapse" in insurance policies:

> . . . Webster's dictionary defines "collapse" as:
>
>> To fall or shrink together as the two sides of a hollow vessel; to fall into a flattened mass, distorted, or disorganized state.
>
> In [other authorities] the term "collapse" is described as follows:
>
>> To break down or fail abruptly and utterly, to cave in; to close by falling or shrinking together, to fall together, or into an irregular mass or flattened form, through loss of firm connection or rigidity and support of the parts or loss of the contents, as a building through the falling in of its sides, or an inflated bladder from escape of the air contained in it, or to fall together suddenly, as the two sides of a hollow vessel . . . .

*Higgins v. Connecticut Fire Ins. Co.*, 430 P.2d 479, 480–81 (1967).  A total ruin is not required: "while not falling completely down to the ground, an object may nonetheless 'collapse' by a flattening or breaking down because of a loss of its structural rigidity or by falling into or against itself."  *Sherman v. Safeco Ins. Co. of Am.*, 670 P.2d 16, 17 (Colo. App. 1983).  Further, where (as here) the policy covers collapse of *part* of a building, the same standard should be applied to discrete parts of the covered property.

*Id.* Such policies do not, however, "permit a finding of 'collapse' when the damage consists only of 'settling, cracking, shrinkage, bulging or expansion.'" *Id.* at 18.

The parties' briefs are impressively unburdened by any specific description of the damage at issue, to which the Court might apply the foregoing definitions. Plaintiffs and Defendant engage in a fair amount of back-and-forth over whether or not the state of the building, or any portion of it, constitutes "collapsed"—but they do so without actually mentioning how far the floor sunk, how large the cracks in the floor and walls were, how much separation between the walls and ceiling there was, or how steeply the listing pool deck sloped, for example. The only evidence cited by Plaintiffs to show that the building was "collapsed" is the final paragraph of a two-page affidavit submitted by one of Plaintiffs' expert witnesses, Marc Cleveland:

> The damage caused by this incident consisted of a significant deflection downward of the floor in a considerable portion of the premises. In addition, supporting walls settled and were deflected with separation between the top of the wall and ceiling. The structural integrity of the building was compromised. The premises were not safe for foot traffic and could not be used for their intended purpose. Although the pools, themselves, were not damaged, due to the design and the fact that they were supported by drilled piers into the bedrock, they were not usable because of the fracture of the plumbing lines and unsafe access to the area.

(Docket No. 27-5.) Notably, this testimony is unrelated to anything contained in Mr. Cleveland's formal report, which opines only that the October 11th water leak caused the soil subsidence and thus the October 13th damage. (Docket No. 28-7.) Further, it fails entirely to describe the condition of the pool deck: it does not say *how far* the floor had deflected, *how far* the walls had separated from the ceiling, or *why* the premises were not safe for foot traffic.

22

Setting aside the parties' briefs, the evidentiary record submitted to the Court

does establish the following, none of which is in dispute:"

- "[T]he floor slabs surrounding the therapy pool had sunk approximately 4 inches." (Docket No. 28-8, p.2.)

- Certain expansion joints "expanded way more than they had ever expanded before. In excess of an inch . . . ." (Docket No. 28-3, p.4.)

- On the "west wall of the family locker room," a crack in the concrete masonry wall "was measured to be 1.5-inches in width," and the concrete masonry bench separated from the lockers. (Docket No. 28-2, p.3.)

- "The northeast entrance door to the therapy room [wa]s difficult to operate due to the differential slab and wall movement. The [concrete masonry] ha[d] been removed from the plumbing line to relieve stress that was exerted on the lines as a result of the slab and wall settlement." (*Id.*, p.4)

- At "the northeast corner of the therapy pool room," the concrete masonry wall "separation from the roof system was measured to be over 5-inches." (*Id.*)

- At "the north wall of the mechanical room," the "separation of the [concrete masonry] wall from the rood system was measured to be approximately 3-inches." (*Id.*, p.5.)

- Differential movement, distress cracks, and settlement existed throughout the locker rooms, therapy pool room, mechanical rooms, lifeguard and pool director's offices, and the family pool room. (*Id.*, pp. 3–5.)

Thus, the evidence shows that the walls cracked up to 1.5 inches in some places;

further, the floor sunk around 4 inches in some places, leading to separation of the walls

from the roof by 3 to 5 inches in some places. Aside from the ceiling's separation from

some walls, no evidence suggests that the roof itself was damaged or in any risk of

falling in. The evidence also suggests that the load-bearing walls were not at risk from

shifting. (*Id.*, p. 3 ("According to . . . the construction plans, *non-bearing* [concrete

masonry] partition walls in the building were founded on thickened slabs-on-grade . . . ."

(emphasis added)).)  Finally, although portions of the building closed for repairs,

including the pools, no evidence suggests that the closure was motivated by concerns

over the structural integrity of any part of the building.  (*See* Docket No. 28-2, pp. 3–4

(affidavit of Plaintiffs' President/CEO, indicating pool remained open at first, later closed

due to leaks); Docket No. 28-4, p.4 (deposition testimony of facility manager indicating

concern over tripping hazard but taking no other action upon discovering damage);

Docket No. 30-2, p.2 (deposition testimony of operations director stating that pool could

not be operated with a tripping hazard, and that pools needed to be closed because

they were "losing a bunch of water").)  To the contrary, the evidentiary record fails to

support any inference that the structural integrity of the building was damaged at all.

These facts fall squarely within the definition of what does *not* constitute collapse

under Colorado law.  *See Sherman*, 670 P.2d at 17 (policies covering collapse of part of

building do not "permit a finding of 'collapse' when the damage consists only of 'settling,

cracking, shrinkage, bulging or expansion'").  Although Plaintiffs argue that the pool

rooms were not fit for their "intended purpose," the evidence shows that this lack of

fitness had nothing to do with sagging or falling walls or ceilings, or any analogous loss

of structural integrity.  As a matter of law, the policy's Additional Coverage – Collapse

provision does not cover this damage.

## Conclusion & Order

Having concluded that the policy does not provide coverage for Plaintiffs' losses,

Plaintiffs' claims for declaratory judgment and for breach of contract fail.  Moreover, the

24

parties have stipulated that, in the absence of coverage, Plaintiffs' claims under C.R.S.

§§ 10-3-1115 & -1116 also fail.  (Docket No. 1, p.9.)

   For the foregoing reasons, it is hereby ORDERED that:

- Defendant's Motion for Summary Judgment (Docket No. 28) is GRANTED;

- Plaintiffs' Motion for Summary Judgment (Docket No. 27) is DENIED;

- Judgment shall enter in favor of Defendant Secura Insurance Company and against Plaintiffs YMCA of Pueblo and YMCA Community Campus, jointly and severally on all claims; and

- Defendant is awarded its costs under Rule 54(d) and D.C.Colo.LCivR 54.1.


Dated: February 6, 2015     */s/ Michael J. Watanabe*
  Denver, Colorado      Michael J. Watanabe
          United States Magistrate Judge